# UNITED STATES *v.* FLORES-MONTANO

No. 02–1794.   Argued February 25, 2004—Decided March 30, 2004

Lisa S. *Blatt* argued the cause for the United States. With her on the briefs were *Solicitor General Olson, Assistant Attorney General Wray, Deputy Solicitor General Dreeben, Daniel S. Goodman,* and *Alfonso Robles.*

Steven F. *Hubachek,* by appointment of the Court, 540 U. S. 1043, argued the cause for respondent. With him on the brief were *Vincent J. Brunkow* and *John C. Lemon.* *

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Customs officials seized 37 kilograms—a little more than 81 pounds—of marijuana from respondent Manuel Flores-Montano's gas tank at the international border. The Court of Appeals for the Ninth Circuit, relying on an earlier decision by a divided panel of that court, *United States* v. *Molina-Tarazon,* 279 F. 3d 709 (2002), held that the Fourth Amendment forbade the fuel tank search absent reasonable suspicion. No. 02–50306, 2003 WL 22410705 (Mar. 14, 2003). We hold that the search in question did not require reasonable suspicion.

Respondent, driving a 1987 Ford Taurus station wagon, attempted to enter the United States at the Otay Mesa Port of Entry in southern California. A customs inspector conducted an inspection of the station wagon, and requested respondent to leave the vehicle. The vehicle was then taken to a secondary inspection station.

---

*Daniel J. *Popeo* and *Richard A. Samp* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging reversal.

*John Wesley Hall, Jr., David M. Siegel,* and *Lisa B. Kemler* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

At the secondary station, a second customs inspector inspected the gas tank by tapping it, and noted that the tank sounded solid. Subsequently, the inspector requested a mechanic under contract with Customs to come to the border station to remove the tank. Within 20 to 30 minutes, the mechanic arrived. He raised the car on a hydraulic lift, loosened the straps and unscrewed the bolts holding the gas tank to the undercarriage of the vehicle, and then disconnected some hoses and electrical connections. After the gas tank was removed, the inspector hammered off bondo (a putty-like hardening substance that is used to seal openings) from the top of the gas tank. The inspector opened an access plate underneath the bondo and found 37 kilograms of marijuana bricks. The process took 15 to 25 minutes.

A grand jury for the Southern District of California indicted respondent on one count of unlawfully importing marijuana, in violation of 21 U. S. C. § 952, and one count of possession of marijuana with intent to distribute, in violation of § 841(a)(1). Relying on *Molina-Tarazon*, respondent filed a motion to suppress the marijuana recovered from the gas tank. In *Molina-Tarazon*, a divided panel of the Court of Appeals held, *inter alia*, that removal of a gas tank requires reasonable suspicion in order to be consistent with the Fourth Amendment. 279 F. 3d, at 717.

The Government advised the District Court that it was not relying on reasonable suspicion as a basis for denying respondent's suppression motion, but that it believed *Molina-Tarazon* was wrongly decided. The District Court, relying on *Molina-Tarazon*, held that reasonable suspicion was required to justify the search and, accordingly, granted respondent's motion to suppress. The Court of Appeals, citing *Molina-Tarazon*, summarily affirmed the District Court's judgment. No. 02–50306, 2003 WL 22410705 (CA9, Mar. 14, 2003). We granted certiorari, 540 U. S. 945 (2003), and now reverse.

In *Molina-Tarazon*, the Court of Appeals decided a case presenting similar facts to the one at bar. It asked "whether [the removal and dismantling of the defendant's fuel tank] is a 'routine' border search for which no suspicion whatsoever is required." 279 F. 3d, at 711. The Court of Appeals stated that "[i]n order to conduct a search that goes beyond the routine, an inspector must have reasonable suspicion," and the "critical factor" in determining whether a search is "routine" is the "degree of intrusiveness." *Id.*, at 712–713.

The Court of Appeals seized on language from our opinion in *United States* v. *Montoya de Hernandez*, 473 U. S. 531 (1985), in which we used the word "routine" as a descriptive term in discussing border searches. *Id.*, at 538 ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant"); *id.*, at 541, n. 4 ("Because the issues are not presented today we suggest no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body-cavity, or involuntary x-ray searches"). The Court of Appeals took the term "routine," fashioned a new balancing test, and extended it to searches of vehicles. But the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person—dignity and privacy interests of the person being searched—simply do not carry over to vehicles. Complex balancing tests to determine what is a "routine" search of a vehicle, as opposed to a more "intrusive" search of a person, have no place in border searches of vehicles.

The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border. Time and again, we have stated that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the

border." *United States* v. *Ramsey,* 431 U. S. 606, 616 (1977). Congress, since the beginning of our Government, "has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Montoya de Hernandez, supra,* at 537 (citing *Ramsey, supra,* at 616–617 (citing Act of July 31, 1789, ch. 5, 1 Stat. 29)). The modern statute that authorized the search in this case, 46 Stat. 747, 19 U. S. C. § 1581(a),[1] derived from a statute passed by the First Congress, the Act of Aug. 4, 1790, ch. 35, § 31, 1 Stat. 164, see *United States* v. *Villamonte-Marquez,* 462 U. S. 579, 584 (1983), and reflects the "impressive historical pedigree" of the Government's power and interest, *id.,* at 585. It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity.

That interest in protecting the borders is illustrated in this case by the evidence that smugglers frequently attempt to penetrate our borders with contraband secreted in their automobiles' fuel tank. Over the past 5½ fiscal years, there have been 18,788 vehicle drug seizures at the southern California ports of entry. App. to Pet. for Cert. 12a. Of those 18,788, gas tank drug seizures have accounted for 4,619 of the vehicle drug seizures, or approximately 25%. *Ibid.* In addition, instances of persons smuggled in and around gas tank compartments are discovered at the ports of entry of

---

[1] Section 1581(a) provides:

"Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance."

San Ysidro and Otay Mesa at a rate averaging 1 approximately every 10 days. *Id.*, at 16a.

Respondent asserts two main arguments with respect to his Fourth Amendment interests. First, he urges that he has a privacy interest in his fuel tank, and that the suspicionless disassembly of his tank is an invasion of his privacy. But on many occasions, we have noted that the expectation of privacy is less at the border than it is in the interior. *Montoya de Hernandez, supra,* at 538. We have long recognized that automobiles seeking entry into this country may be searched. See *Carroll* v. *United States,* 267 U. S. 132, 154 (1925) ("Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in"). It is difficult to imagine how the search of a gas tank, which should be solely a repository for fuel, could be more of an invasion of privacy than the search of the automobile's passenger compartment.

Second, respondent argues that the Fourth Amendment "protects property as well as privacy," *Soldal* v. *Cook County,* 506 U. S. 56, 62 (1992), and that the disassembly and reassembly of his gas tank is a significant deprivation of his property interest because it may damage the vehicle. He does not, and on the record cannot, truly contend that the procedure of removal, disassembly, and reassembly of the fuel tank in this case or any other has resulted in serious damage to, or destruction of, the property.[2] According to

---

[2] Respondent's reliance on cases involving exploratory drilling searches is misplaced. See *United States* v. *Rivas,* 157 F. 3d 364 (CA5 1998) (drilling into body of trailer required reasonable suspicion); *United States* v. *Robles,* 45 F. 3d 1 (CA1 1995) (drilling into machine part required reasonable suspicion); *United States* v. *Carreon,* 872 F. 2d 1436 (CA10 1989) (drilling into camper required reasonable suspicion). We have no reason at this time to pass on the reasonableness of drilling, but simply note the obvious factual difference that this case involves the procedure of removal, disassembly, and reassembly of a fuel tank, rather than potentially de-

the Government, for example, in fiscal year 2003, 348 gas tank searches conducted along the southern border were negative (*i. e.*, no contraband was found), the gas tanks were reassembled, and the vehicles continued their entry into the United States without incident. Brief for United States 31.

Respondent cites not a single accident involving the vehicle or motorist in the many thousands of gas tank disassemblies that have occurred at the border. A gas tank search involves a brief procedure that can be reversed without damaging the safety or operation of the vehicle. If damage to a vehicle were to occur, the motorist might be entitled to recovery. See, *e. g.*, 31 U. S. C. § 3723; 19 U. S. C. § 1630. While the interference with a motorist's possessory interest is not insignificant when the Government removes, disassembles, and reassembles his gas tank, it nevertheless is justified by the Government's paramount interest in protecting the border.[3]

For the reasons stated, we conclude that the Government's authority to conduct suspicionless inspections at the border includes the authority to remove, disassemble, and reassemble a vehicle's fuel tank. While it may be true that some

structive drilling. We again leave open the question "whether, and under what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it is carried out." *United States* v. *Ramsey*, 431 U. S. 606, 618, n. 13 (1977).

[3] Respondent also argued that he has some sort of Fourth Amendment right not to be subject to delay at the international border and that the need for the use of specialized labor, as well as the hour actual delay here and the potential for even greater delay for reassembly are an invasion of that right. Respondent points to no cases indicating the Fourth Amendment shields entrants from inconvenience or delay at the international border.

The procedure in this case took about an hour (including the wait for the mechanic). At oral argument, the Government advised us that, depending on the type of car, a search involving the disassembly and reassembly of a gas tank may take one to two hours. Tr. of Oral Arg. 10. We think it clear that delays of one to two hours at international borders are to be expected.

searches of property are so destructive as to require a different result, this was not one of them. The judgment of the United States Court of Appeals for the Ninth Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, concurring.

I join the Court's opinion in full. I also note that Customs keeps track of the border searches its agents conduct, including the reasons for the searches. Tr. of Oral Arg. 53–54. This administrative process should help minimize concerns that gas tank searches might be undertaken in an abusive manner.