RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0315p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 05-6588

OLUYEMISI MUINAT LAWSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 05-00024—David L. Bunning, District Judge.

Argued: August 9, 2006

Decided and Filed: August 24, 2006

Before: MOORE and SUTTON, Circuit Judges; KATZ, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Carl E. Knochelmann, Jr., Covington, Kentucky, for Appellant. Robert K. McBride, ASSISTANT UNITED STATES ATTORNEY, Covington, Kentucky, for Appellee. **ON BRIEF:** Carl E. Knochelmann, Jr., Covington, Kentucky, for Appellant. Robert K. McBride, ASSISTANT UNITED STATES ATTORNEY, Covington, Kentucky, Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. Oluyemisi Lawson challenges the district court's denial of her motion to suppress evidence obtained from a search of her luggage upon her arrival from an international flight at the Cincinnati/Northern Kentucky Airport. Because customs officials did not need reasonable suspicion to x-ray her luggage during this "border" search and because they had reasonable suspicion that she possessed narcotics when they drilled a 3/8-inch hole in, and cut the liner in, her luggage, we affirm.

_____

[*]The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

I.

On February 24, 2005, customs officer Heidi Tien identified Oluyemisi Lawson, a passenger on an incoming flight from Paris to the Cincinnati/Northern Kentucky Airport, as a potential drug courier. According to the flight manifest, Lawson had made her reservation the day before and had paid for her $1700 ticket in cash. Her passport had been issued overseas. And Lawson's travel history revealed that in November 2004, she had flown to Memphis and had declared her destination to be an address that agents had previously associated with "known and suspected heroin smugglers that have been intercepted in Cincinnati and other airports." JA 95. Based on this information, Tien alerted customs officers that Lawson fit the profile of a potential drug courier.

When Lawson's flight arrived later that day, Tien identified Lawson and her 16-month-old son at the baggage carousel, where she retrieved three suitcases. Along with other passengers, Lawson passed through a primary checkpoint where customs officers examined her passport and then asked her to move to a secondary inspection area. Tien and two other officers asked Lawson to verify that the luggage was hers, then asked her who had paid for the plane ticket and when. She responded that "her husband paid for her ticket in cash two weeks ago," JA 176, a response that was not consistent with the passenger manifest.

After asking these questions and receiving these answers, the officers examined the three bags. They emptied the contents of the first bag and unzipped and removed the interior liner, at which point they could see that the bag "had been tampered with." JA 110. "[A]t the bottom of the bag there was a plastic piece with hardware that was changed out"—some of the original rivets holding the piece in place had been replaced with screws—"and [the piece] was cracked down the middle." JA 178. The crack was covered with a piece of clear tape. In addition, the bag's retractable handle, which should have been long enough that "an average size person could hold it and pull [the wheeled bag] along," "only came out about 6 inches," JA 111, instead of approximately 24 inches, as the officers expected based on the size of the bag. As the officers made these discoveries, they observed Lawson grow "visibly nervous." *Id*.

Based on this apparent tampering with the bag, the officers x-rayed it. The x-rays showed "the hollow nature of the [bag's] handle" as well as a "denser image in the [handle's] tube where it should have been just [as] hollow." JA 117. To determine the source of this anomaly, the officers removed the "cap" of the handle and peered down the tube but could not see anything. JA 182. The officers "made a small incision on the interior of the bag" to expose the handle tubes and observed that "some modification" had been made to the handle tube. JA 124. Tapping the tube elicited a "metal thump, not a hollow ping," which confirmed the officers' suspicion "that there was something in the tube." JA 183.

Unable to see into the tube, the officers drilled a 3/8-inch hole in it at the point where the x-rays showed the "denser image." JA 117, 124. "[A]n off-white powdery substance came out with the drill," JA 113, which field tests showed to be heroin. The officers also discovered heroin stored similarly in the remaining two bags. The officers arrested Lawson and charged her with conspiring to import one kilogram or more of a substance containing a detectable amount of heroin. *See* 21 U.S.C. §§ 846, 952, 960.

Lawson filed a motion to suppress the evidence. The district court rejected the motion, and Lawson entered a conditional plea to the charge reserving her right to appeal the suppression ruling. The district court imposed a (conditional) 44-month sentence.

II.

Generally speaking, border searches "are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538

(1985). "Time and again" the Supreme Court has said "that searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004) (internal quotation marks omitted); *see also United States v. Ramsey*, 431 U.S. 606, 618 (1977). This principle, however, is not without exception. Some searches—"'highly intrusive searches of the person,'" *Flores-Montano*, 541 U.S. at 152, or those carried out in a "particularly offensive manner," *id*. at 154 n.2—still require "reasonable suspicion," *see, e.g.*, *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) ("Although routine border searches of a person's belongings are made reasonable by that person's decision to enter this country, more invasive searches, like strip searches, require reasonable suspicion."); *cf. Montoya de Hernandez*, 473 U.S. at 542 (requiring reasonable suspicion to detain a traveler and investigate whether she "was smuggling narcotics in her alimentary canal").

Lawson rightly concedes that this search, conducted at a customs checkpoint after the arrival of an international flight, occurred at the functional equivalent of the country's border. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973). And she rightly concedes that the officers' examination of "the contents of her luggage, including the dismantling and reassembly of the handle," was part of a "routine border search" and thus could be undertaken without any individualized suspicion. Lawson Br. at 18; *see United States v. Alston*, No. 89-5104, 1989 WL 113908, at *1 (6th Cir. Oct. 2, 1989) (upholding a "warrantless border search[]" of luggage "without probable cause or even articula[ble] suspicion"); *see also, e.g.*, *Irving*, 452 F.3d at 124 ("[T]he search of Irving's luggage was valid regardless of whether Customs officials conducting the search had or did not have reasonable suspicion.").

Where Lawson parts company with the government is over the customs officers' actions in (1) x-raying her bag and (2) cutting it and drilling into it. The officers did both things without reasonable suspicion, she submits, making both actions unconstitutional.

As to the x-ray of her luggage, the officers did not need reasonable suspicion before undertaking this examination, one that has become a customary feature of commercial airline travel. An x-ray examination of a *person*, it is true, may require some level of suspicion because it may present risks to health that an x-ray examination of luggage will not present and because it may permit greater intrusions into the privacy and dignity of the individual. *See, e.g.*, *Montoya de Hernandez*, 473 U.S. at 541 n.4 (expressing "no view on what level of suspicion, if any, is required for . . . strip, body cavity, or involuntary x-ray searches"); *see also United States v. Hernandez*, 424 F.3d 1056, 1059 (9th Cir. 2005) (acknowledging that x-ray searches of persons may be "potentially harmful to the health of the suspect") (internal quotation marks omitted). But "the same is not true about x-rays of objects." *United States v. Okafor*, 285 F.3d 842, 845 (9th Cir. 2002); *cf. Flores-Montano*, 541 U.S. at 152 ("[T]he reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person—dignity and privacy interests of the person being searched—simply do not carry over to vehicles.").

As any airline traveler over the last several years well knows, luggage is routinely x-rayed at the airport, whether in connection with domestic or international flights. *See United States v. Allman*, 336 F.3d 555, 557 (7th Cir. 2003) ("[W]e have trouble seeing how, in this age of routine, soon to be universal, x-raying of containers shipped by air, the defendant could have had a reasonable expectation that his package would not be x-rayed at any point during transit."). X-ray examinations of luggage represent a "minimally intrusive" form of investigation and offer few risks of embarrassment to passengers. *See United States v. Johnson*, 991 F.2d 1287, 1293 (7th Cir. 1993) (observing that "an X-ray examination" takes "only a few minutes and [i]s minimally intrusive, causing no harm to the suitcase and no embarrassment or indignity to [the suspect]," that "thousands of airport users subject their luggage to the same procedure each day" and that the suspect "could

not have reasonably expected that her suitcase would pass through customs without being subjected to an X-ray examination"); JA 131 (customs officer describing the use of the x-ray machine in this case) ("[Y]ou can't see details, like, you can't tell if that is a pair of pants and that is a shirt. . . . I can identify, based on the shape and the density, what those items might be, but it doesn't say, you know, this is a can of hair spray versus a can of shaving cream. I can just tell you that there's a can, aerosol in nature, or there's clothing or hangers."). In contrast to x-ray examinations of individuals, moreover, there are no health concerns associated with x-rays of luggage, and the risks to luggage potentially associated with x-ray examinations (*e.g.*, the destruction of film) are eminently manageable.

Perhaps most significantly, the greater intrusion to privacy and dignity that attends the routine border search that Lawson rightly concedes was appropriate in this instance (opening and reviewing the contents of luggage and occasionally removing those contents) assuredly permits the lesser intrusion that accompanies a discrete x-ray examination of one's luggage away from the "unwanted gaze" of fellow travelers. *See United States v. Vega-Barvo*, 729 F.2d 1341, 1346 (11th Cir. 1984) (noting that x-ray examinations of luggage are "less intrusive than an officer . . . personally examining the contents of the passenger's luggage"); *United States v. Henry*, 615 F.2d 1223, 1227 (9th Cir. 1980) (noting that an "x-ray scan . . . . is less intrusive than a physical search"); *cf.* Jeffrey Rosen, *The Unwanted Gaze* (2000). Indeed, several circuits have held that x-ray examinations of luggage do not require individualized suspicion even in the context of airport searches that are not at the border, a point we need not resolve today. *See United States v. Hartwell*, 436 F.3d 174, 181 (3d Cir. 2006) (Alito, J.) (upholding the x-ray examination of luggage in the context of a non-border search "even though it was initiated without individualized suspicion"); *United States v. Smith*, 643 F.2d 942, 944 (2d Cir. 1981); *United States v. Clay*, 638 F.2d 889, 890 (5th Cir. 1981).

Under these circumstances, we accept the commonsense (and commonly observed) conclusion that customs officers may x-ray an airline passenger's luggage at the border without reasonable suspicion—a conclusion that several other courts have embraced and that none (to our knowledge) has rejected. *See Okafor*, 285 F.3d at 846 ("We hold that examination of luggage and other containers by x-ray or other technological means may be done at the border with no required showing of particularized suspicion."); *United States v. Oriakhi*, 57 F.3d 1290, 1295, 1297 (4th Cir. 1995) (holding that the "search of [the suspect] at J.F.K. Airport"—the initial step of which was "to examine [his] bags . . . with a portable x-ray machine"—was a "routine" border search and therefore could be conducted "without . . . any level of individualized suspicion"); *United States v. Udofot*, 711 F.2d 831, 839–40 (8th Cir. 1983) (upholding the "x-raying of appellant's luggage" once the court determined that the search was a border search and without analyzing what quantum of suspicion the government possessed);*United States v. Restrepo Naranja*, 643 F. Supp. 154, 160 (S.D. Fla. 1986) ("[T]he warrantless x-ray search of the Defendant's outbound baggage was reasonable and proper pursuant to the 'border search exception' . . . .").

The customs officers also did not violate Lawson's Fourth Amendment rights when they cut the liner in her luggage, then drilled a hole in it. Even assuming for the sake of argument that these acts required reasonable suspicion, a point we need not decide, *cf. United States v. Chaudhry*, 424 F.3d 1051, 1053 (9th Cir. 2005) (concluding "that a single 5/16-inch hole drilled in the bed of a pickup truck does not require reasonable suspicion"), the officers reasonably suspected that Lawson's luggage contained contraband when they performed these acts.

In prior travels, Lawson had declared her destination to be an address connected with drug smuggling. The trip in question began in Lagos, Nigeria, a city that Tien knew to be "a significant source of heroin seizures in the United States." JA 92. She claimed that her husband had purchased her ticket two weeks before the flight, while the manifest revealed that she had paid for it in cash and had done so just the day before. She appeared nervous and avoided eye contact. *See United*

*States v. Sokolow*, 490 U.S. 1, 3 (1989) (relying on a suspect's "nervous" appearance in reasonable-suspicion calculation). Her suitcase had been tampered with in multiple ways: a plastic piece beneath the interior lining had been cracked and had been reattached using new hardware; the crack had been covered with tape; and the retractable handle extended only a fraction of its normal length. The x-ray examination revealed an unusual density within the handle tubes, which the officers confirmed by tapping on the tubes. Each incremental step by the investigating officers justified the next incremental intrusion into Lawson's property. And by the time the officers cut and drilled into the luggage, the officers' suspicion that Lawson was smuggling drugs in the handle tubes "was a common-sense conclusion about human behavior upon which [they were] entitled to rely." *Montoya de Hernandez*, 473 U.S. at 542 (internal quotation marks and brackets omitted).

Lawson points out that her nervousness could have sprung from the fact that in Nigeria "women have a different social status than men." Lawson Br. at 19. What the Supreme Court said in rejecting a similar argument in *Sokolow* applies with equal force here. "Any one of these factors," the Court explained, "is not by itself proof of any illegal conduct" and may well be "consistent with innocent travel." *Sokolow*, 490 U.S. at 9. "But . . . taken together they amount to reasonable suspicion." *Id.* (rejecting Fourth Amendment argument where the suspect fit a drug courier profile, appeared nervous and had not checked any luggage).

Equally unavailing is Lawson's claim that "[t]he shortened extension of the handles was identical for all suitcases which would indicate a common manufacturer" and contraband-free luggage. Lawson Br. at 19. This of course is one inference that the customs officers could have drawn, but it is hardly the only one and hardly the most reasonable one. That *all three* pieces of luggage contained extension handles that were too short to permit the traveler to pull the luggage behind her suggests either a common (and useless) manufacturing design or that something was amiss with respect to all three pieces of luggage, which would of course increase the officers' suspicion. The officers did not act unreasonably in taking the latter view.

Lawson also points out that "[t]here is no [x-ray] image available for [her] or the Court to review to determine whether the image viewed by the agent did i[n] fact justify a further search." Lawson Br. at 19–20. Lawson offers no authority to support this argument, and the number of x-rays performed by customs officers each day, to say nothing of the uncertainty over whether this x-ray equipment could have handled such a requirement, make this proposed requirement an imposing one. *See* JA 116 ("The [x-ray] system's not capable of recording those images at this time."). For present purposes, it suffices to say that the district judge heard the officers' testimony about what the x-rays revealed, considered Lawson's cross-examination and ultimately "found each [government] witness to be highly credible"—a finding that Lawson has not contested. *See* D. Ct. Op. at 2 n.1. Under these circumstances, the district court did not err in refusing to require the government to produce the x-ray image of Lawson's luggage.

Nor did the officers act unreasonably in the way (and the extent to which) they cut and drilled into the luggage. The record shows that the bag remained as functional after the search as it was before it. The district court found that "[t]he cut was to the innermost lining of the bag, which did not render the bag unuseable nor the cut even visible to the eye once the interior lining was zipped back in place. The hole drilled in the rail was small, could easily be taped or covered over if necessary, and also did not interfere with the function of the luggage." *Id.* at 15. On this record, we agree with the district court that "the manner of inspection here" was not conducted in such an "offensive or destructive manner as to be unreasonable." *Id.* at 16.

III.

For these reasons, we affirm.