[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15059

_____

D.C. Docket No. 8:16-cr-00021-JDW-MAP-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HERNANDO JAVIER VERGARA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 15, 2018)

Before WILLIAM PRYOR, JILL PRYOR and CLEVENGER,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

_____

[*] Honorable Raymond C. Clevenger III, United States Circuit Judge for the Federal Circuit,
sitting by designation.

This appeal presents the issue whether warrantless forensic searches of two cell phones at the border violated the Fourth Amendment. U.S. Const. amend IV. Hernando Javier Vergara appeals the denial of his motion to suppress evidence found on two cell phones that he carried on a cruise from Cozumel, Mexico to Tampa, Florida. He argues that the recent decision of the Supreme Court in *Riley v. California*, 134 S. Ct. 2473 (2014)—that the search-incident-to-arrest exception to the warrant requirement does not apply to searches of cell phones—should govern this appeal. But we disagree. The forensic searches of Vergara's cell phones occurred at the border, not as searches incident to arrest, and border searches never require a warrant or probable cause. At most, border searches require reasonable suspicion, but Vergara has not argued that the agents lacked reasonable suspicion to conduct a forensic search of his phones. We affirm.

## I. BACKGROUND

Vergara returned to Tampa, Florida on a cruise ship from Cozumel, Mexico, with three phones: a Samsung phone inside a bag in his luggage, an LG phone, and an iPhone. Christopher Ragan, an officer with Customs and Border Protection, identified Vergara and searched his luggage. When Ragan found the Samsung phone in Vergara's luggage, he asked Vergara to turn the phone on and then looked through the phone for about five minutes. During this search, Ragan found

2

a video of two topless female minors. After watching a few seconds of that video, Ragan called investigators for the Department of Homeland Security.

After viewing the video and interviewing Vergara, Terri Botterbusch, a special agent with the Department of Homeland Security, decided to have all three phones forensically examined. Agents later returned the iPhone to Vergara's niece after a forensic examination revealed that it did not contain any child pornography.

A forensic examination of the Samsung and LG phones conducted that day revealed more than 100 images and videos, "the production of which involved the use of a minor engaging in sexually explicit conduct and the visual depictions were of such conduct." Neither the earlier manual search nor the forensic examinations damaged the phones. A grand jury later indicted Vergara on two counts: (1) that he "did knowingly transport in and affecting interstate and foreign commerce one or more visual depictions, the production of which involved the use of a minor engaging in sexually explicit conduct and such visual depictions were of such conduct"; and (2) that he "did knowingly possess numerous matters that had been shipped and transported using any means and facility of interstate and foreign commerce, including by computer, which matters contained visual depictions of minors engaging in sexually explicit conduct and the production of which involved the use of minors engaging in sexually explicit conduct." *See* 18 U.S.C. § 2252(a)(1), (b)(1); 18 U.S.C. § 2252(a)(4)(B), (b)(2).

Vergara filed a motion to suppress the evidence obtained from his cell phones. The court held a suppression hearing, at which Ragan and Botterbusch testified, and later denied Vergara's motion. The district court ruled that the initial manual search did not require reasonable suspicion and found that "in any event, . . . Agent Ragan had reasonable suspicion to search the applications and settings of the phone for evidence of child pornography." The district court also rejected Vergara's argument that *Riley v. California*, 134 S. Ct. 2473 (2014), required the agents to obtain a warrant before conducting the forensic search. It reasoned that *Riley* did not apply to border searches. It agreed with the government that "if [Vergara] had entered the country with child pornography images in a notebook, the notebook would have been subject to inspection, and he cannot be allowed to insulate himself from inspection by storing child pornography electronically on his cell phone." And it concluded that, in any event, the search was supported by reasonable suspicion.

At a later bench trial, the district court found Vergara guilty of both counts and later sentenced him to ninety-six months imprisonment on each count concurrently followed by supervision for life.

## II. STANDARD OF REVIEW

"With regard to [a] motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*." *United States v.*

4

*Newsome*, 475 F.3d 1221, 1223 (11th Cir. 2007). We construe all facts "in the light most favorable to the prevailing party below." *Id.* at 1224 (internal quotation marks omitted). And "[t]he individual challenging the search bears the burdens of proof and persuasion." *Id.* (internal quotation marks omitted).

### III. DISCUSSION

The Fourth Amendment to the U.S. Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. Ordinarily, "where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, reasonableness . . . requires the obtaining of a judicial warrant." *Riley*, 134 S. Ct. at 2482 (alterations adopted) (internal quotation marks omitted). But searches at the border, "from before the adoption of the Fourth Amendment, have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." *United States v. Ramsey*, 431 U.S. 606, 619 (1977). Border searches "never" require probable cause or a warrant. *Id.* And we require reasonable suspicion at the border only "for highly intrusive searches of a person's body such as a strip search or an x-ray examination." *United States v. Alfaro-Moncada*, 607 F.3d 720, 729 (11th Cir. 2010).

5

The forensic searches of Vergara's phones required neither a warrant nor probable cause. "The Supreme Court has consistently held that border searches are not subject to the probable cause and warrant requirements of the Fourth Amendment." *United States v. Vega-Barvo*, 729 F.2d 1341, 1344 (11th Cir. 1984) (citing *Ramsey*, 431 U.S. at 619). Instead, "they are simply subject to that amendment's more amorphous reasonableness standard." *United States v. Villabona-Garnica*, 63 F.3d 1051, 1057 (11th Cir. 1995). The "longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself." *Ramsey*, 431 U.S. at 619. And "[t]here has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause." *Id.*; *see also United States v. Montoya de Hernandez*, 473 U.S. 531, 537–38 (1985).

Vergara argues that *Riley* required a warrant for both the manual and the forensic searches of his phones, but he challenges only the forensic searches because no evidence from the manual search was admitted as evidence against him. In *Riley*, the Supreme Court addressed the constitutionality of warrantless manual searches of cell phones following the arrest of two defendants in the United States. 134 S. Ct. at 2480–82. And the Supreme Court expressly limited its holding to the search-incident-to-arrest exception. It explained that "even though [that]

6

exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 2494.

Border searches have long been excepted from warrant and probable cause requirements, and the holding of *Riley* does not change this rule. Vergara points to language from *Riley* about the "consequences for privacy" involved in a search of a cell phone. *Id.* at 2489. But this language does not help him. At the border, the highest standard for a search is reasonable suspicion, *see Vega-Barvo*, 729 F.2d at 1344–45, and Vergara has not challenged the finding of the district court that reasonable suspicion existed for the searches of his phones. So we need not—and do not—address the questions whether reasonable suspicion was required for the searches or whether reasonable suspicion existed.

## IV. CONCLUSION

We **AFFIRM** Vergara's judgment of conviction and sentence.

JILL PRYOR, Circuit Judge, dissenting:

In this case we decide for the first time whether a warrantless forensic search of a cell phone at the United States border comports with the Fourth Amendment. To determine whether a law enforcement practice is constitutional, courts must balance its promotion of legitimate government interests against its intrusion on an individual's Fourth Amendment rights. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). Here, we weigh the government's interest in conducting warrantless forensic cell phone searches at the border with Hernando Vergara's privacy interest in his cellular devices and the data they contain.

The majority opinion concludes that this balance weighs heavily in the government's favor because the searches occurred at the border. I agree with the majority that the government's interest in protecting the nation is at its peak at the border, but I disagree with the majority's dismissal of the significant privacy interests implicated in cell phone searches, as articulated by the Supreme Court in *Riley v. California*, 134 S. Ct. 2473 (2014). Because *Riley* did not involve a border search, I acknowledge that I can, at best, attempt to predict how the Supreme Court would balance the interests here. But my weighing of the government's heightened interest at the border with Vergara's privacy interest in his cell phones leads me to a result different than the majority's. I respectfully dissent because, in

8

my view, a forensic search of a cell phone at the border requires a warrant supported by probable cause.

## I.    BACKGROUND

Vergara, a United States citizen, arrived at the Port of Tampa, Florida, having returned from a vacation in Cozumel, Mexico.  Before his return, U.S. Customs and Border Protection ("CBP") had identified Vergara based on his prior conviction for possession of child pornography, placing him on a list of the day's "lookouts."  Individuals on the list are subjected to secondary screening at the border, which involves additional questioning and searching.

When Vergara arrived at the port, CBP Agent Christopher Ragan escorted him to the secondary inspection area.  In Vergara's luggage, Ragan found two cell phones, a Samsung phone and an iPhone.  Vergara also had a third cell phone on his person.  Ragan took the Samsung phone and began looking through the photos on it, as well as "a couple apps," finding nothing of interest.  Doc. 63 at 12.[1]  Ragan then began viewing videos, one of which depicted topless females he believed were minors.  Ragan contacted Special Agent Terri Botterbusch, a criminal investigator with the Department of Homeland Security.  When Botterbusch arrived, she spent a few seconds viewing the video, observing underage, topless females and the logo of a website that she knew distributed child

---

[1] All citations in the form "Doc. #" refer to the district court docket entries.

pornography. She determined that the video was child erotica, meaning it depicted children and was sexual in nature, but it failed to meet the statutory definition of child pornography.

The agents "[did not] have the capability to forensic[ally] analyze the phone at the port of entry." Doc. 63 at 23. Botterbusch therefore seized Vergara's cell phones and took them to her office so "forensic agents" could conduct a full forensic examination. *Id.* at 31. The record does not detail the mechanics of the forensic examination, but Botterbusch testified that it involved the "extraction of data" from the cell phones and that she believed it had been completed "that afternoon." *Id.* at 39. The forensic search ultimately revealed more than 100 images and videos of child pornography and erotica stored on Vergara's phones.

Based on evidence procured from the forensic search, Vergara was arrested and charged with knowingly transporting child pornography, in violation of 18 U.S.C. § 2252(a)(1) and (b)(1), and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). He filed a motion to suppress the child pornography found on his cell phones; the district court denied the motion. Vergara agreed to a bench trial based on stipulated facts, and the district court found him guilty. He was sentenced to 96 months of imprisonment. Vergara appealed.

## II.    DISCUSSION

The Fourth Amendment establishes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend IV. "As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley*, 134 S. Ct. at 2482 (internal quotation marks omitted). In general, reasonableness requires the government to obtain a judicial warrant supported by probable cause prior to conducting a search. *Id.* To "determine whether to exempt a given type of search from the warrant requirement," courts weigh the degree to which the practice promotes "legitimate governmental interests" against "the degree to which it intrudes upon an individual's privacy." *Id.* at 2484. This case requires us to balance the government's interest in protecting the integrity of the border against Vergara's privacy interest in the data extracted from his cell phones.

Congress has granted the Executive Branch the "plenary authority to conduct routine searches . . . at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Montoya de Hernandez*, 473 U.S. at 537. This exception to the warrant requirement "is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *United States v. Ramsey*, 431

11

U.S. 606, 620 (1977).  Because of the "paramount interest in protecting . . . its territorial integrity," the government's interest at the border is "at its zenith." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).

Given the government's heightened interest, the Supreme Court has held, for example, that at the border mail may be opened without a warrant, vehicles may be stopped without individualized suspicion, and boats may be boarded "with no suspicion whatever."  *Montoya de Hernandez*, 473 U.S. at 538; *see also Flores-Montano*, 541 U.S. at 155 (holding that at the border a vehicle's gas tank may be disassembled and searched without any suspicion).  Consistently with the Supreme Court's cases involving routine border searches, we have held that living quarters on a ship may be searched at the border absent any suspicion.  *United States v. Alfaro-Moncada*, 607 F.3d 720, 732 (11th Cir. 2010).  Such searches "are reasonable simply by virtue of the fact that they occur at the border." *Flores-Montano*, 541 U.S. at 152-53 (internal quotation marks omitted).

But the government's authority at the border is not without limits.  In *Montoya de Hernandez*, for example, the Supreme Court held that the prolonged detention of a woman who was suspected of smuggling narcotics within her alimentary canal was "beyond the scope of a routine customs search" and thus required some level of suspicion.  *Montoya de Hernandez*, 473 U.S. at 541. Although the Court expressed "no view" on the level of suspicion required for

12

"nonroutine border searches," *id.* at 541 n.4, our circuit has held that "highly intrusive searches of a person's body such as a strip search or an x-ray examination" require reasonable suspicion, *Alfaro-Moncada*, 607 F.3d at 729.

Neither the Supreme Court nor any federal circuit court has determined the level of suspicion required to justify the forensic search of a cell phone at the border.[2] But in *Riley*, the Supreme Court suggested an answer by holding that probable cause and a warrant are required to manually search a cell phone following a lawful arrest. 134 S. Ct. at 2485. The Supreme Court described in *Riley* the significant privacy interests that individuals hold in the contents of their cell phones. And, as I will explain, the privacy interests implicated in *forensic* searches are even greater than those involved in the manual searches at issue in *Riley*. In view of those interests, I would hold that a forensic search of a cell phone at the border requires a warrant supported by probable cause.[3]

As the Supreme Court made clear in *Riley*, cell phones are fundamentally different from any object traditionally subject to government search at the border.

---

[2] In *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013), the Ninth Circuit determined that a forensic search of a laptop computer at the border required reasonable suspicion. That case, however, was decided prior to the Supreme Court's decision in *Riley*, which, as I explain below, suggests that probable cause and a warrant might be required for a forensic search of a cell phone even at the border.

[3] As the majority notes, because the evidence leading to Vergara's conviction stemmed only from the forensic search, we need not consider the level of suspicion required to support the initial, manual search of the cell phones.

13

*See id.* at 2489 (explaining that "[t]he term 'cell phone' is itself misleading," given that such devices "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.")  Because of their "immense storage capacity," these devices "differ in a quantitative . . . sense" from the luggage, vehicles, envelopes, and boats that may be searched at the border without suspicion.  *Id.*  Unlike those physical objects, cell phones have the capacity to store "millions of pages of text, thousands of pictures, or hundreds of videos."  *Id.*

Before cell phones, border searches were limited by "physical realities" that ensured any search would impose a relatively narrow intrusion on privacy.  *See id.*  Individuals could not carry across the border all the mail they had received, pictures they had taken, and books they had read.  *See id.*  When it comes to cell phone searches, though, these "physical realities" no longer exist.  *Id.*  And, as the Court predicted in *Riley*, the "gulf between physical practicability and digital capacity will only continue to widen."  *Id.*[4]

Beyond these quantitative differences, the data cell phones contain is "also qualitatively different" from the information gleaned by searching luggage, living

---

[4] At the time *Riley* was decided, the "top-selling smart phone" had a standard capacity of 16 gigabytes—the equivalent of millions of physical pages of text.  *Riley*, 134 S. Ct. at 2489. Today, the standard storage capacity of that smart phone has doubled to 32 gigabytes.  *See* Tech Specs for Apple iPhone 7, https://www.apple.com/iphone-7/specs/ (last visited Mar. 13, 2018).

14

quarters, and even an individual's person. *Id*. at 2490. A cell phone's internet search history can "reveal an individual's private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD." *Id*. Cell phone data also may "reveal where a person has been." *Id*. And cell phone applications as well as data offer a range of information on such private and personal topics as addiction, religious practices, pregnancy, personal finances, and romance. *See id.*

The Supreme Court recognized in *Riley* that given the vast amounts of personal information contained on a cell phone, a cell phone search "typically expose[s] to the government far *more* than the most exhaustive search of a house," which has historically received the Fourth Amendment's most stringent protections. *Id*. at 2491. Indeed, a cell phone "not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." *Id.*

Although the government's interest at the border is undoubtedly greater than it was in searching the arrestees in *Riley*, Vergara's privacy interests are greater here, too. In *Riley*, the officers searched the arrestees' cell phones by viewing videos, reading text messages, and scrolling call logs. Here, Vergara's cell phones were forensically searched. Although the record does not reveal what that

15

examination entailed, generally, forensic searches are "experts' work," performed "by a trained analyst at a government forensics laboratory." Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 537 (2005). These examinations reveal "a wealth of information about how the [device] and its contents have been used." *Id.* at 542. Significantly, forensic searches are "capable of unlocking password-protected files, restoring deleted material, and retrieving images viewed on web sites." *Cotterman*, 709 F.3d 952, 957 (9th Cir. 2013). The manual searches in *Riley* were of great concern to the Supreme Court; the forensic examination of cell phones should be of even greater concern given the much more extensive—and more heavily protected from a privacy standpoint—information it may expose.

Of course, the border search exception to the warrant requirement "rests not only on the heightened government interests . . . but also on [travelers'] reduced privacy interests" at the border. *Riley*, 134 S. Ct. at 2488; *see Montoya de Hernandez*, 473 U.S. at 539 ("[T]he expectation of privacy is less at the border than in the interior."). But a "diminished privacy interest[] does not mean that the Fourth Amendment falls out of the picture entirely." *Riley*, 134 S. Ct. at 2488. Instead, when the "privacy-related concerns are weighty enough," as they are in a forensic search of a cell phone, the search may require a warrant, "notwithstanding the diminished expectations of privacy." *Id.* (internal quotation marks omitted).

16

Applying the Supreme Court's reasoning in *Riley*, the rationales underlying the border search exception lose force when applied to forensic cell phone searches. The border search exception is rooted in the government's interest in controlling "who and what may enter the country." *Ramsey*, 431 U.S. at 620. But cell phones do not contain the physical contraband that border searches traditionally have prevented from crossing the border, "whether that be communicable diseases, narcotics, or explosives." *Montoya de Hernandez*, 473 U.S. at 544. And cell phone searches are ill suited to prevent the type of contraband that may be present on a cell phone from entering into the United States. Unlike physical contraband, electronic contraband is borderless and can be accessed and viewed in the United States without ever having crossed a physical border.

To be sure, forensically searching a cell phone may lead to the discovery of physical contraband. A drug smuggler's deleted text messages, for example, may reveal the location of drugs inside the border. But this general law enforcement justification is quite far removed from the purpose originally underlying the border search exception: "protecting this Nation from entrants who may bring anything harmful into this country." *Id.* Excepting forensic cell phone searches from the warrant requirement because those searches may produce evidence helpful in

17

future criminal investigations would thus "untether the rule from [its] justifications." *Riley*, 134 S. Ct. at 2485 (internal quotation marks omitted).

The government argues that requiring probable cause and a warrant before conducting a forensic search would allow "terrorists, spies, [and] smugglers" to cross the border knowing their "devices will be immune from random, unpredictable, and suspicionless searches." Appellee's Br. at 26. Certainly, cell phones may contain information about past, present, and future criminal activity. But obtaining a warrant before extracting data from a cell phone is "not merely an inconvenience to be . . . weighed against the claims of police efficiency"; instead, it is a process essential to the "machinery of our government." *Riley*, 134 S. Ct. at 2493 (internal quotation marks omitted). The warrant requirement prevents the government from boundlessly intruding on individuals' privacy "on the mere chance that desired evidence might be obtained." *Montoya de Hernandez*, 473 U.S. at 540 n.3 (internal quotation marks omitted). And—critically—in the proper circumstances, border officers may still rely on the exigent circumstances exception to conduct a warrantless forensic search. *See Riley*, 134 S. Ct. at 2494.

Relative to the importance of the warrant requirement in protecting individual privacy in the type of information a forensic search can reveal—the government's burden in seeking a warrant is minimal. Indeed, the same technological advances that have enabled "smart" cellular devices have made the

18

process of obtaining a warrant more efficient. The Federal Rules of Criminal Procedure allow judges to issue warrants "by reliable electronic means." Fed. R. Crim. P. 4.1(b)(6)(C). As the Supreme Court noted in *Riley*, in some jurisdictions officers can e-mail warrant requests to judges and receive responses in fewer than 15 minutes. 134 S. Ct. at 2493.

Forensic searches are themselves an involved process, making the added burden on the government of seeking a warrant slight. In general, forensic examinations require "analysts [to] sift through the mountain of data in a hard drive and locate specific types or pieces of data." Kerr, *Searches and Seizures in a Digital World*, *supra* page 9, at 538. This process involves "a range of software programs to aid the search, [and] can take many days or even weeks to complete." *Id.* In this case, Agent Botterbusch had to transport Vergara's phones to her office where special forensic agents had to conduct the forensic search. Requiring border officers to seek a warrant before beginning a forensic search, then, would add relatively little time to an already time-intensive process.

I disagree with the majority that *Riley* is irrelevant to the forensic searches of Vergara's cell phones because the Supreme Court "expressly limited its holding to the search-incident-to-arrest exception." Maj. Op. at 7. The majority relies on the Supreme Court's statement that "other case-specific exceptions may still justify a warrantless search of a particular phone." *Riley*, 134 S. Ct. at 2494. But that

19

statement was in response to the government's "extreme hypotheticals" about the danger of requiring a warrant to search an arrestee's cell phone, for example, when "a suspect [is] texting an accomplice who . . . is preparing to detonate a bomb."  *Id.* To allay the government's concerns, the Supreme Court clarified that exceptions to the warrant requirement, like the exigent circumstances exception, would still be available in the proper circumstances.  *Id.*

I acknowledge, of course, that because *Riley* concerned a distinct exception to the warrant requirement, it does not compel the outcome I advocate here.  The Supreme Court clarified that it was not holding "that the information on a cell phone is immune from search."  *Id.* at 2493.  But unlike the majority, I do not read *Riley* so narrowly as to prevent its application to cell phone searches in other contexts, including at the border.  As the Court went on to explain in *Riley*, "[its holding was] instead that a warrant is generally required before [a cell phone] search, *even when* a cell phone is seized incident to arrest."  *Id.* (emphasis added). I believe we must look to *Riley* to inform our analysis of Vergara's privacy interest in his cell phones—the very same interests held by the arrestees in *Riley*—to determine whether a warrant is required for a forensic cell phone search *even when* the search occurs at the border.  Due to the extreme intrusion into privacy posed by a forensic cell phone search—well beyond the intrusion posed by a manual

20

search—I would hold that Vergara's privacy interest outweighs the government's interest in conducting such a search, even at the border.

I note finally that, as the first federal circuit court to determine whether a warrant is required to conduct a forensic search of a cell phone at the border post-*Riley*, the majority's decision likely will have a profound impact on law enforcement practices at our ports of entry and on the individuals subjected to those practices. Last year, customs officers searched more than 30,000 cell phones or other electronic devices of people entering and leaving the United States— nearly a 60 percent increase over the previous year.[5] Meanwhile, for the more than 95 percent of Americans who own cell phones,[6] these devices contain "the privacies of life" the Fourth Amendment exists to protect. *Riley*, 134 S. Ct. 2495 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). My answer to the question of what law enforcement officials must do before forensically searching a cell phone at the border, like the Supreme Court's answer to manually searching a cell phone incident to arrest, "is accordingly simple—get a warrant." *Id.*

---

[5] *CBP Releases Updated Border Search of Electronic Device Directive and FY17 Statistics*, U.S. Customs and Border Protection (Jan. 5, 2018), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-updated-border-search-electronic-device-directive-and.

[6] Pew Research Center, Mobile Fact Sheet (Feb. 5, 2018), http://www.pewinternet.org/fact-sheet/mobile/.