**UNITED STATES of America,
Plaintiff,**

**v.**

**Michael Timothy ARNOLD Defendant.**

**No. CR 05–00772ADDP.**

United States District Court,
C.D. California.

Oct. 2, 2006.

**1000**

Joey L. Blanch, U.S. Attorneys, Los Angeles, CA, for Plaintiff.

Marilyn E. Bednarski, Kevin J. LaHue, Kaye, McLane & Bednarski, Pasadena, CA, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

PREGERSON, District Judge.

This matter comes before the Court on defendant Michael Arnold's motion to suppress evidence. On July 17, 2005, Customs and Border Patrol ("CBP") Officers at Los Angeles International Airport ("LAX") searched Arnold's laptop, hard drive, compact discs ("CDs"), and memory stick. Following the search, Arnold was indicted for transportation of child pornography and possession of a computer hard drive and CDs containing images of child pornography. Arnold contends that the warrantless search of his computer equipment violated his Fourth Amendment rights.

In response to Arnold's motion, the government contends that the border search of information stored in a computer hard drive is not subject to Fourth Amendment protection. The government also argues that, even if the minimal Fourth Amendment standard of reasonable suspicion applies to such searches, its search of Arnold's laptop, hard drive, CDs and memory stick comported with that standard.

The question presented is whether the government can conduct a border search of the private and personal information stored on a traveler's computer hard drive or electronic storage devices without Fourth Amendment review. This is an issue of first impression in this Circuit. It is also an issue ripe for determination because technological advances permit individuals and businesses to store vast amounts of private, personal and valuable information within a myriad of portable electronic storage devices including laptop computers, personal organizers, CDs, and cellular telephones.

The Court concludes that Fourth Amendment protection extends to the search of this type of personal and private information at the border. While not physically intrusive as in the case of a strip or body cavity search, the search of one's private and valuable personal information stored on a hard drive or other electronic storage device can be just as much, if not more, of an intrusion into the dignity and privacy interests of a person. This is because electronic storage devices function as an extension of our own memory. They are capable of storing our thoughts, ranging from the most whimsical to the most profound. Therefore, government intrusions into the mind—specifically those that would cause fear or apprehension in a

reasonable person—are no less deserving of Fourth Amendment scrutiny than intrusions that are physical in nature.

The Court further concludes that the correct standard requires that any border search of the information stored on a person's electronic storage device be based, at a minimum, on a reasonable suspicion. To proceed with its search in this case, the government needed a reasonable suspicion that the confidential information stored on Arnold's computer equipment contained evidence of a crime. Based on the testimony presented at the hearing, the Court is not satisfied that the Government had a reasonable suspicion supported by objective, articulable facts to search Arnold's laptop, hard drive, and storage devices. Accordingly, the Court grants the motion to suppress.

## I. BACKGROUND

The following facts are not in dispute:

On July 17, 2005, forty-three year-old Michael Arnold arrived at LAX after a nearly twenty-hour flight from the Philippines. He had flown coach and was tired from the flight. He was dressed in casual clothes, which were not ragged or worn. His hair was short, and he had a goatee.

After retrieving his luggage from the baggage claim, Arnold proceeded to customs. CBP Officer Laura Peng first saw Arnold while he was in line waiting to go through the customs checkpoint.

After Arnold went through the checkpoint, Peng selected him for secondary questioning. She asked Arnold where he had traveled, the purpose of his travel, and the length of his trip. Arnold stated that he had been on vacation for three weeks visiting friends in the Philippines.

Peng then inspected Arnold's luggage, which contained his laptop computer, a separate hard drive, a computer memory stick (also called a flash drive or USB drive), and six CDs. Peng instructed Arnold to turn on the computer so she could see if it was functioning. While the computer was booting up, Peng turned it over to her colleague, CBP Officer Roberts, and continued to inspect Arnold's luggage.

When the computer had booted up, its desktop displayed numerous icons and folders. Two folders were entitled "Kodak Pictures" and one was entitled "Kodak Memories." The CBP Officers clicked on the Kodak folders, opened the files, and viewed the photos on Arnold's computer.

During the search, Peng and Roberts viewed a photo that depicted two nude women.[1] Roberts called in supervisors, who in turn called in special agents with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"). The ICE agents questioned Arnold about the contents of his computer and detained him for several hours. They examined the computer equipment and found numerous images depicting what they believed to be child pornography.

The officers seized the computer and storage devices and released Arnold. Two weeks later, federal agents received a warrant to search the computer and storage devices. The images found in their search, along with the images found in the initial airport search, are the subject of this motion.

## II. DISCUSSION

**A. The Fourth Amendment Requires the Government to Possess a Reasonable Suspicion to Perform a Search That Implicates the Privacy and Dignity Interests of a Person**

The Fourth Amendment protects the right of the people to be secure in their

---

1. The government has not presented evidence that the photo depicted minors.

persons, houses, papers, and effects against unreasonable searches and seizures. U.S. Const. amend IV. With few exceptions, warrantless searches are per se unreasonable. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One of the exceptions is at the nation's border. *United States v. Montoya de Hernandez,* 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); *United States v. Ramsey,* 431 U.S. 606, 617, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).

 border search is made in the enforcement of customs laws, as distinct from general law enforcement, and for the purposes of regulating the collection of duties and preventing the introduction of contraband into the United States. *Montoya de Hernandez,* 473 U.S. at 537, 105 S.Ct. 3304. The reasonableness of a border search is determined by balancing the need for a particular search against the invasion that the search entails. *United States v. Guadalupe–Garza,* 421 F.2d 876, 878 (9th Cir.1970). Some searches are so intrusive that they require particularized suspicion to be reasonable. *Id.* at 879 (holding that border officials must have real suspicion directed specifically at that person to justify a strip search).

The balance is struck more favorably toward the government because of the lessened expectation of privacy and the need to protect the nation's borders. *United States v. Flores–Montano,* 541 U.S. 149, 152, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004) (reasoning that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border."). As a result of the heightened need of the government, the examination of items such as luggage, purses, wallets, and pockets is considered "routine" and requires no suspicion. *Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. 3304; *United States v. Vance,* 62 F.3d 1152, 1156 (9th Cir.1995). Yet, the

oft-quoted phrase "searches made at the border ... are reasonable simply by virtue of the fact that they occur at the border" belies the fact that highly intrusive searches are not reasonable merely because they take place at the border. *Flores–Montano,* 541 U.S. at 152–53, 124 S.Ct. 1582 (quoting *Ramsey,* 431 U.S. at 616, 97 S.Ct. 1972).

 Although neither a warrant nor probable cause is needed for ordinary searches of persons and things crossing the border, cause is required for more intrusive border searches. Certain border searches are highly intrusive because they implicate the "dignity and privacy interests of the persons being searched." *Flores–Montano,* 541 U.S. at 152, 124 S.Ct. 1582. As a search becomes more intrusive, it must be justified by a correspondingly higher level of suspicion of wrongdoing. *United States v. Aman,* 624 F.2d 911, 912–13 (9th Cir.1980) (holding that to conduct a strip search, the authorities must have a "real suspicion" that the person is smuggling contraband and that "real suspicion" is "subjective suspicion supported by objective, articulable facts" (quoting *United States v. Rodriguez,* 592 F.2d 553, 556 (9th Cir.1979))).

 Courts have found that certain "non-routine" or intrusive border searches require a heightened level of suspicion to be reasonable. *Guadalupe–Garza,* 421 F.2d at 879 (holding that border officials must have subjective suspicion supported by objective, articulable facts to justify a strip search); *Henderson v. United States,* 390 F.2d 805, 808 (1967) (holding that a body cavity search without a heightened level of suspicion is considered unreasonable). In addition, an invasive search must be limited in scope. *United States v. Price,* 472 F.2d 573, 574–75 (9th Cir.1973) (holding that after officers strip searched the defendant and dispelled their initial

suspicion with respect to the bulge in defendant's waist, they were not justified to continue searching).

■ A search is reasonable in scope only if it is no more intrusive than necessary to obtain the truth respecting the suspicious circumstances. *United States v. Palmer*, 575 F.2d 721, 723 (9th Cir. 1978). The objective facts must bear some reasonable relationship to the degree of suspicion. *Price*, 472 F.2d at 574. For example, to conduct a body cavity search, which is considered a "serious invasion of personal privacy and dignity," a "clear indication" of possession of narcotics must exist. *Henderson*, 390 F.2d at 808 (citing *Rivas v. United States*, 368 F.2d 703, 710 (9th Cir.1966)).

Reiterating this principle in *United States v. Vance*, 62 F.3d 1152 (9th Cir. 1995), the Ninth Circuit held that as the intrusiveness of a search increases, so does the need for suspicion. *Id.* at 1156. In *Vance*, the customs inspector conducted a pat-down search of Vance after noticing that his eyes were glassy, he looked like he was on drugs, and his trip was too short to make sense. *Id.* at 1155. The Court noted that a pat-down required Vance to spread-eagle against a wall and have a strangers' hands touch his body. *Id.* at 1156. It held that "minimal suspicion" was required to conduct a pat-down and what the customs officers knew before they patted Vance down sufficed to establish "minimal suspicion." *Id.*

■ Hence, an invasive border search must be limited in scope, and the scope must meet the reasonableness standard of the Fourth Amendment. *Price*, 472 F.2d at 574. In the Ninth Circuit, such non-routine searches require at least reasonable suspicion. *United States v. Ramos–Saenz*, 36 F.3d 59, 61 (9th Cir.1994); *see also United States v. Ek*, 676 F.2d 379, 382 (9th Cir.1982) (holding that there must be a "clear indication" or "plain suggestion"

that the person is carrying contraband in his or her body to conduct a body cavity search). In the case of non-routine, invasive searches that implicate personal privacy and dignity, customs agents must possess a reasonable suspicion.

**B. The Search of a Computer Hard Drive and Similar Electronic Storage Devices Implicates Privacy and Dignity Interests of a Person**

■ Supreme Court recognized in *Flores–Montano* that highly intrusive searches of persons implicate dignity and privacy interests. *Flores–Montano*, 541 U.S. at 152, 124 S.Ct. 1582. Likewise, opening and viewing confidential computer files implicates dignity and privacy interests. Indeed, some may value the sanctity of private thoughts memorialized on a data storage device above physical privacy. *See United States v. Molina–Tarazon*, 279 F.3d 709, 716 (9th Cir.2002) (recognizing that "government intrusions into the mind—specifically those that would cause fear or apprehension in a reasonable person—are no less deserving of Fourth Amendment scrutiny than intrusions that are physical in nature"), *rev'd on other grounds, Flores–Montano*, 541 U.S. 149, 124 S.Ct. 1582, 158 L.Ed.2d 311.

The government argues that the officers searched Arnold's tangible property, not his person, and therefore the search was routine and did not require reasonable suspicion. However, as the Court recognized during the evidentiary hearing, the information contained in a laptop and in electronic storage devices renders a search of their contents substantially more intrusive than a search of the contents of a lunchbox or other tangible object.

A laptop and its storage devices have the potential to contain vast amounts of information. People keep all types of per-

sonal information on computers, including diaries, personal letters, medical information, photos and financial records. Attorneys' computers may contain confidential client information. Reporters' computers may contain information about confidential sources or story leads. Inventors' and corporate executives' computers may contain trade secrets. In this case, Arnold kept child pornography on his laptop and in his storage devices; however, "[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." *Montoya de Hernandez,* 473 U.S. at 548, 105 S.Ct. 3304 (Brennan, J., dissenting) (quoting *United States v. Rabinowitz,* 339 U.S. 56, 69, 70 S.Ct. 430, 94 L.Ed. 653 (1950)) (Frankfurter, J., dissenting).

## C. The Government's Search in This Case Was Not Based on a Reasonable Suspicion

On August 25, 2006, the Court conducted an evidentiary hearing on Arnold's motion to suppress. During the hearing, the Court listened to testimony from Peng and Arnold about the circumstances giving rise to the search. Based on this testimony and the evidence introduced by the parties, the Court concludes that the government's search of Arnold was not based on an articulable, reasonable suspicion.

First, the government has not provided the Court with any record of the search that was completed at or near the time of the incident. The only writing that contemporaneously memorialized the search is a standard customs report that Peng and various officers filled out after the search occurred. The government did not introduce this customs report into evidence. Peng testified that she did not write her reasons for searching Arnold in her portion of the customs report.

Although the customs report was not introduced into evidence, and Peng had not written the complete report herself, Peng relied on the report when preparing a memorandum regarding the search. This memorandum, written nearly a year after the search, is Peng's only memorialized account of the incident. The memorandum is slightly longer than one page, and was prepared by Peng at the government's request. The government relied on Peng's memorandum when preparing her declaration. Peng's declaration and testimony are the sole factual basis for the government's opposition to this motion.

Given these facts, the Court is not satisfied with the government's broken chain of documentation in this case. To determine whether the government had an objectively reasonable basis for searching Arnold, the Court must rely on accounts of the circumstances surrounding the search. Here, the Court has no means of reviewing the government's initial account of the search. Instead, the Court must rely on a memorandum written a significant period of time after the search occurred and based in part on the recollections of other people. Moreover, although Peng testified that she relied on the customs report to prepare her account of the search, Peng also stated that she had never written her reasons for searching Arnold in the customs report. Because Peng's recollection of the search was based largely on a document that Peng herself had not written and which, by Peng's own admission, did not explain her rationale for searching Arnold, the Court must view skeptically the government's claim that Peng's search was based on an articulable reasonable suspicion.

Furthermore, the Court has serious concerns about Peng's ability to recall the search accurately. During her testimony, Peng appeared to have only a vague mem-

ory of the circumstances of the search. For example, Peng could not recall how long Arnold had been waiting in line before the search, or how long she observed Arnold before she searched him. Moreover, although Peng testified about Arnold's physical appearance and demeanor, she could not remember what Arnold was wearing, the length of his hair, or if he had a goatee. Similarly, Peng could not say whether Arnold was looking at his laptop when she took it out of his suitcase, or if he was looking at his dirty clothes on the table. Peng's inability to remember the details of the search damages her credibility as a witness.

Moreover, when Peng did provide testimony about the search, it was often imprecise and internally inconsistent. For example, one of Peng's stated justifications for searching Arnold was his age. At the beginning of her testimony, Peng stated that on the evening of the search, she was targeting single men traveling from Asia who were in their "30s to 50s." Later, Peng stated that Arnold fit her profile as a man in his "20s to 30s." Putting Peng's two statements together, it appears that Peng was profiling men aged 20–59. Because this age range is so broad as to be meaningless, Peng's stated reliance on Arnold's age is insufficient to justify the government's search. Furthermore, in giving two different answers to the same question, Peng contradicted herself. Given that the government's key witness could not consistently identify one of her primary reasons for searching the defendant, the Court has serious concerns about relying on her testimony.

The Court is also concerned about the lack of consistency among Peng's memorandum, her declaration, and her testimony. For example, Peng's memorandum did not contain any description of Arnold's purported demeanor. In her declaration and testimony, however, Peng stated that

Arnold appeared nervous, shifted his weight, and listened to the conversations between the passengers in front of him and the CBP officers. Moreover, in her declaration, Peng stated that she moved Arnold's laptop some distance away from his luggage as she went through his belongings. However, at the hearing, she stated that she moved the laptop a foot or "maybe a little less" from his suitcase.

Finally, in her declaration, Peng described Arnold as "disheveled." When asked what "disheveled" meant, Peng stated that "disheveled" meant "out of it." She then testified that disheveled was not her word; it came from the government's counsel.

When taken together, these inconsistencies significantly undermine the credibility and trustworthiness of Peng's testimony. Because Peng's testimony formed the basis of the government's opposition to this motion, the serious problems with her testimony are fatal to the government's case.

Peng's testimony not only contradicted itself; it frequently ran counter to common experience. Peng testified that one reason she searched Arnold was that he did not become agitated when she pulled him aside for secondary questioning. When asked to clarify her response, Peng stated that U.S. citizens who are selected for secondary questioning typically become agitated and mad. Peng explained that "normal" behavior for U.S. citizens selected for secondary questioning consisted of "yelling and screaming." While the Court can certainly accept that some citizens may become upset when asked additional questions by a customs agent, describing such behavior as the norm belies common experience.

Peng's testimony about Arnold's answers to her questions is similarly illogical. Peng characterized Arnold's statements about whom he had visited and his previ-

ous employment as "evasive," and she cited his vagueness as a justification for her search.[2] Later in her testimony, however, Peng admitted that she did not ask Arnold questions that would require specific answers, and she did not "push him" to clarify his answers. In light of this admission, the Court cannot conclude that Arnold's answers to Peng's questions were evasive or suspicious.

The Court does not believe that Peng's intent was to misstate the circumstances of the search. However, she did not memorialize her own account of the search when it occurred, and did not understand vocabulary in her own declaration. Given Peng's failure to contemporaneously record her account of the search, her inability to describe the events with specificity or precision, and her inconsistent testimony, the Court is not able to resolve any factual disputes in the government's favor.

When determining whether a Fourth Amendment violation has occurred, it is the government that bears the burden of demonstrating that its search was reasonable. Here, the government has presented no credible evidence that Arnold was behaving in a way that would justify an invasive search. When Peng approached Arnold, he had just completed a twenty-hour flight from the Philippines. During this flight, he had passed through many time zones. He had been waiting in a long customs line with 200 to 300 other travelers. As Peng testified, there is no one way that someone behaves while waiting in the customs line after arriving in the United States on a long, international flight. Even if Arnold was moving around in the customs line, listening to others' conversations, and looking at his laptop when Peng went through his luggage, such behavior is not inconsistent with that of an innocent traveler, waiting in a customs line after a 20–hour flight, who is approached by an officer for secondary questioning and whose personal belongings are being inspected.

▇▇▇ Furthermore, even presuming that Peng thought Arnold looked nervous, nervousness is likely a common reaction to questioning by government officials. Moreover, nervousness alone does not warrant reasonable suspicion. *See Guadalupe–Garza,* 421 F.2d at 879–80 (holding that the fact that the appellant "tilted his head," "shied away," and appeared nervous did not warrant the suspicion required for a strip search). A search based on such highly subjective, generalized criteria as "nervousness" cannot withstand constitutional scrutiny.

In every Fourth Amendment case, the Court must consider the circumstances of the search without the benefit of hindsight. The fact that the officers' search uncovered what they believe to be child pornography does not transform what was at best a hunch into the reasonable suspicion necessary for an invasive search. "[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." *United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Thus, to justify its intrusive search, the government must show that the search was based on an articulable reasonable suspicion that Arnold was carrying contraband in his laptop computer. For the foregoing reasons, the government has not met its burden in this case. Accordingly,

---

**2.** Peng testified that she asked Arnold questions about his employment before she opened files on his laptop. By contrast, Arnold testified that she did not ask him additional questions until she had viewed his files.

If the Court takes Arnold's testimony as true, then Arnold's purported "evasiveness" about his employment could not have given rise to a reasonable suspicion necessary to justify the computer search.

the Court holds that the government's search of Arnold's computer and electronic storage devices violated the Fourth Amendment. Therefore, all evidence obtained as a result of this illegal search must be suppressed.

## III. CONCLUSION

In balancing the Fourth Amendment interests here, on one side is the desire to prevent the clear evil of smuggling through laptops and other storage devices child pornography and other informational contraband, such as the plans for a bomb or a list of possible terrorist suspects. In our information age, such contraband can flow with the click of a mouse through the Internet. On the other side of the scale is the liberty interest in one's ability to travel with vast amounts of private information. This information can be highly personal, privileged, and valuable. To conduct a search of this type without reasonable suspicion goes well beyond the goals of the customs statutes and the reasonableness standard articulated in the Fourth Amendment. Therefore, while it is appropriate to turn on or x-ray a laptop or other device to ensure that it functions and does not physically contain drugs or other dangerous substances, a search of the information contained therein requires a reasonable suspicion.

The airport search of Arnold's laptop, CDs, hard drive and memory stick was not supported by reasonable suspicion. The government must sustain the burden of establishing the constitutionality of the search and seizure of the laptop and storage devices. Because it has not done so, the Court grants the motion to suppress.

IT IS SO ORDERED.